## DAVIDSON v. GULF, C. & S. F. RY. CO. et al.

### No. 14003.

Court of Civil Appeals of Texas.
Fort Worth.

Jan. 12, 1940.

Rehearing Denied Feb. 23, 1940.

Rawlings & Sayers and Nelson Scurlock, all of Fort Worth, for appellant.

Terry, Cavin & Mills, of Galveston, and Wren & Jeffrey, of Fort Worth, for appellees.

SPEER, Justice.

Plaintiff, W. E. Davidson, sued Gulf, Colorado & Santa Fe Railway Company, which we shall refer to as the Railway Company, and the Fort Worth Union Passenger Station Company, which we shall call the Station Company, for damages occasioned by an injury sustained by him when his foot was severed by the wheels of the Railway Company's train.

It is unnecessary to state in detail the pleadings of the parties, since there is no

issue made that they were insufficient upon which to base the testimony relied upon.

The acts of negligence charged to defendants as proximately causing plaintiff's injuries were substantially: (a) failure to have the premises where plaintiff was injured sufficiently lighted; (b) failure to keep a watchman at the point to warn the public of the latent dangers while using the space between the tracks for passage, especially while the Railway Company had the street crossing blocked; (c) failure to have an employee to cover the open box after it had been used for servicing the train; and (d) a failure to keep and maintain a safe means of ingress and egress, particularly for persons approaching the depot from the east. Sufficient allegations were made covering the damages claimed, including hospital and doctor's bills, as well also loss of time and diminished earning capacity.

Defendants' answers consisted of general and special demurrers, general denial and such special pleas as that adequate provisions were made for public entrance to the station from the Jones Street side; an exit was provided at the east side for passage to and from passenger trains; a passenger shed and platform 600 feet long was provided east of the station, that it was well lighted and suitable for uses intended. That all grounds east of the platform (where plaintiff was injured) were equipped for and only intended to be used by employees; the boxes for hose connections were located on the opposite side of trains while loading and unloading passengers; they were necessary for servicing trains; that no provisions were made or intended to be made for passage by the public to pass from 17th Street to the station over and across the premises attempted to be used by plaintiff at the time of the accident.

A jury trial was demanded, but at the conclusion of plaintiff's testimony the court sustained a motion by defendants for an instructed verdict, and upon that verdict judgment was entered, denying plaintiff a recovery. An appeal by writ of error was perfected.

Plaintiff bases his appeal upon two propositions, the first of which is in substance as follows: Since the evidence in this case shows that the Station Company, for a valuable consideration, permitted the Yellow Cab Company to operate a service to and from the station, and the plaintiff, while going to the station to obtain that service, using a part of the grounds which was constantly used by pedestrians, with the consent and acquiescence of defendants, he must be considered as an invitee; the defendants owed plaintiff the duty to maintain their premises in a reasonably safe condition, and were obligated to give warnings of latent and concealed perils.

The second proposition urged for a reversal is based upon the same state of facts set out in the first proposition, and concludes with this language: "He, the plaintiff, if not an invitee, was not a trespasser, but a mere licensee; so that plaintiff would be entitled to recover damages for the injury sustained by him, caused by the active negligence on the part of the employees of the railway company in leaving the lid off the concrete water box, which created a new and dangerous condition along the way used by plaintiff, which was the usual way of approaching the station from the east on Seventeenth Street, when the crossing is blocked."

The instructed verdict by the court and the propositions urged here will necessitate a somewhat lengthy statement of the evidence.

The statement of facts definitely describes the grounds at and around the place of the accident. The station in the City of Fort Worth is located on the east side of Jones Street, having its entrance facing that street; it is operated by the Station Company. The passenger trains of several companies, including the defendant Railway Company, stop there for loading and unloading passengers. Jones Street, upon which the station fronts, runs north and south; all railway tracks lie east of the street and, in the main, parallel it. The area covering the space of about four city blocks north and south, and extending east some distance, is known as the Railway Company's yards, where it maintains many tracks used in connection with its freight and passenger service. These yards and station grounds are bounded on the south by 17th Street and on the north by 9th Street, each of which runs east and west, extending from toward the business district, and crosses Jones Street. West of Jones Street are also 16th, 15th and 14th Streets, extending at right angles from toward the business district, but each terminates at Jones Street. The Station building has a door on its east side, through which passengers go to and from the trains. There are two large sheds near the station,

one of which is about 350 feet long and extends from the south end of the station toward 17th Street; this shed is referred to in the record as train shed number one, seems to be used almost exclusively for loading and unloading express and is not important insofar as this appeal is concerned. Shed number two is east of number one and extends from a point 150 feet north of the station building to a point south, even with shed number one, and in all is approximately 600 feet long. Number two is used for loading and unloading passengers. The space under the shed is referred to as the passenger platform and is paved with bricks and extends to within about eighteen inches of the track on either side; the pavement or platform is approximately even with the sides of passenger coaches while standing by its side. Track number one lies adjacent to the east side of the passenger shed and platform. When passenger trains come into the station, only the doors of the coaches on the side next to the platform are opened to permit passengers to enter or leave the coaches. The platform is well lighted from overhead. This shed's south end is approximately 150 feet north of 17th Street, which is the south boundary of the station grounds and railroad yards. There are many tracks east of passenger track number one, the nearest one being about six feet away and parallels number one. All tracks east of number one are used only for occupancy by rolling stock, switching purposes and such other uses necessary for handling and servicing box cars and passenger equipment when not in use. All of the grounds extending from 17th Street north are covered with chat or fine gravel. Between passenger track number one and the track immediately east of it the railway company maintains five or six concrete boxes with iron lids on them, the tops of which are flush with the ground or gravel. Inside of these boxes are water, steam and air connections for attachment of hose with which to service passenger trains while standing on passenger track number one. The steam box connection is about midway between 17th Street and the south end of the passenger shed. The other boxes are approximately two coach lengths or 140 feet apart and extend north to the end of the passenger shed.

Plaintiff was riding in the car of another man, going west on 17th Street just south of the railroad yards, at about 11 o'clock on the night of August 24th, 1937. He observed that a passenger train had the crossing blocked, and at a point approximately 100 feet from the track, got out of the car. The driver of the car observed that a tire was almost flat and turned around and went back east to find a filling station to service his tire. Plaintiff walked west on 17th Street to where the train stood on passenger track No. 1, next to the east side of the passenger shed. He had started to the station to procure a taxi cab, if any were there, to take him to his home, and if no cabs were there he expected to walk on up town. He walked north between track No. 1 and the first track east. He had previously visited the station and knew the entrance was on Jones Street, and that if there were any cabs at the station they would be on Jones Street.

There were no lights in the vicinity of where he left 17th Street, but he could see lights at the passenger shed; some light filtered through car windows and from under the passenger train beside which he was walking. He passed the steam box and observed escaping steam. At another place he saw wet places on the ground, although it had not been raining. The train started moving south, the direction in which it was headed. He saw a headlight from an engine on the track to his right and walked closer to the moving train on his left. He stepped into one of those open boxes and fell toward the moving passenger train, was struck on the shoulder with some part of the train and in his effort to extricate himself from further danger, his left foot was run over and severed; he was carried to a hospital, where his leg was amputated about midway between the ankle and knee.

The evidence further discloses that the area in the vicinity of the railroad yards is devoted largely to negro and Mexican houses; with the usual number of domino halls and chili parlors found in such districts. The brewery and other industrial plants are situated north of the yards. Prior to the date of the injury complained of, persons living south of the yards, in going to the business district and to the industrial plants, passed through the grounds above described, walking along the railroad tracks and between them, as did the plaintiff on the occasion when he was injured. They walked across the yards because if their destination was northwest it was a nearer route. Plaintiff had never before

crossed the grounds, as he attempted to do on the occasion of the accident. He had worked for a railway company at Waco, Texas, for nearly twenty years, was somewhat familiar with station grounds and railway yards and had learned something of water boxes maintained by railway companies around their stations. Plaintiff is a lawyer and has practiced his profession and worked for insurance companies, as an adjuster part of the time, since 1931. He was a member of the 43rd Legislature during 1933–4.

The matters mentioned are not in dispute, as are some of those to which we shall later refer.

Under the first proposition urged by plaintiff (appellant) it is not contended that he was an invitee upon the premises, because he expected to become a passenger on one of the outgoing trains using the passenger station, but he does insist that because the Station Company had contracted with the Yellow Cab Company for it to transact a taxicab service from the station, he had an implied invitation to come there for that service.

Plaintiff relies upon the rule laid down in Bustillos v. Southwestern Portland Cement Co., Tex.Com.App., 211 S.W. 929. That case involved liability for the death of a child from falling in a pit of hot embers beside a path commonly used by persons coming to defendant's plant, especially by the wives and children of employees, while bringing lunches to employees who were not permitted by the employer to have enough time at the lunch hour to go out and get their lunches elsewhere. It was held that the injured child was, at the time of his death, on an errand connected with the business of defendant, and was in the interest of the company through a necessary service to one of its employees. The well-known principles applicable to the liability of the owner of premises to invitees are laid down in the opinion, which requires the use of ordinary care to provide them a reasonably safe means of ingress and egress. In the course of the opinion, the court quotes with approval from the case of Plummer v. Dill, 156 Mass. 426, 31 N.E. 128, 129, 32 Am. St.Rep. 463, where it is said: "To come under an implied invitation, as distinguished from a mere license, the visitor must come for a purpose connected with the business in which the occupant is engaged, or *which he permits to be carried on there.* * * *"" (Italics are ours.)

The first paragraph of the contract between Station Company and the Cab Company provides: "First Party (the Station Co.) during the term of this agreement, insofar as it can lawfully do so, will give to Second Party (Yellow Cab Company) the privilege of transferring passengers and baggage from the station of the First Party to the passenger stations of other Railroad Companies, and of delivering passengers and baggage to hotels and residences in the City of Fort Worth, Texas, as well as of soliciting the transfer of passengers and baggage on the premises of the Fort Worth Union Passenger Station."

The contract further provides that the Station Company will set apart to the Cab Company sufficient space on its property, in close proximity to the depot, for the purpose of parking its cars, and also leases to it a small space in the station room for a desk and such office equipment as is necessary in connection with the cab service, all at an agreed rental price of $50 per month. There is a further provision in the contract which states that under no circumstances shall the checkmen of the Cab Company solicit passengers for any other interest.

A representative of the Cab Company testified upon the trial that in connection with the transfer business carried on "down there", the taxicab drivers would haul anyone who comes to them and was willing to pay the fare.

Plaintiff was not a passenger, as contemplated in the contract between the Station Company and the Cab Company, and did not come within the class for which those parties had contracted. Even though the Cab Company would have accepted employment for its services by any member of the public, to be hauled from that point to any part of the city, it was not shown that the Station Company, through any of its representatives, knew that the Cab Company had previously performed such services or that it stood willing to do so in the future. In the circumstances it cannot be said that the Station Company was permitting another (the Cab Company) to carry on a business at the station, which was in no way connected with or pertaining to passengers patronizing the station. Plaintiff contends that the contract to which we have referred did not prohibit the Cab Company from doing a general business at the station; but it is sufficient to say that with the limitations found in the contract

and absent its knowledge that additional services were being rendered, the Station Company was not "permitting" to be carried on at its station a general taxicab service, such as contended for by plaintiff.

The manager of the taxicab service testified that a representative always went to the station before the arrival of passenger trains to ascertain, if he could, the probable number of cabs necessary to accommodate the passengers coming in; he would then telephone to the main office of the Cab Company to send that number of cars; the telephone used by the Cab Company at the station had no outside or general connection other than with the main office. He further said that when trains departed all representatives of the Cab Company left the station.

The services provided for in the contract were connected with and for the interest of the Station Company, but certainly a deal between plaintiff and the Cab Company, to haul him to his home in the city, could not be said to be in connection with or in the interest of the business conducted by the Station Company. The mutual or beneficial relationship between plaintiff and defendants, under the circumstances, were no more than if plaintiff had attempted to find a taxicab at any other point in the city. The evidence does not disclose that there were any taxicabs at the station when the plaintiff received his injuries. The train was leaving the station, and if any presumption may be indulged, it may be said that the taxicabs were likewise leaving, as testified to by the manager.

What has been said is more especially applicable to defendant Station Company, but since it appears that the Railway Company was in no way interested in the operation of the depot premises, assuredly no liability on its part was shown, under this proposition.

In Shawver v. American Ry. Express Co. et al., Tex.Civ.App., 236 S.W. 800, writ refused, plaintiff sued the Express Company and two railway companies for damages sustained while going to a U. S. mailbox on the premises of the defendants. It was alleged that the Express Company negligently permitted the handle of a truck to extend onto the platform provided by the railway companies, and that she stumbled over the handle and received an injury. It was claimed that the nature of defendants' business was such that the public was expressly and impliedly invited to use the same, even upon such missions as that of plaintiff. It was there held that plaintiff, while on a mission to post a letter, was not an invitee, but at most was a licensee, and that such passive negligence as permitting the truck handle to fall down upon the platform did not render the Express Company liable for damages.

Somewhat similar to the case last cited is Kruse v. Houston & T. C. R. Co., Tex. Civ.App., 253 S.W. 623. In that case the railway company had given plaintiff permission to place bales of cotton on its platform as he bought them from farmers and to weigh them to ascertain the amount to be paid. While weighing the cotton, plaintiff received an injury from a defect in the platform. It was held that the defendant had no interest in the work being done by plaintiff, and could not possibly profit as a result of the transaction. That the benefit, if any, to the company, from the use plaintiff was making of the platform was too contingent and remote to constitute him an implied invitee.

In discussing the first proposition made by plaintiff, we have done so without regard to the fact that he was on the Railway Company's premises at a place not prepared for nor intended to be used by persons other than employees. We have concluded and so hold that plaintiff was not an invitee by the defendants, either express or implied. The proposition and assignments of error upon which it is based are overruled.

By his second proposition, as shown above, plaintiff contends that if he was not actually an invitee, he was a licensee and that the active negligence of the employees of the Railway Company, in leaving the lid off the box into which he stepped, created a new and dangerous condition along the route usually and customarily used by the public in approaching the station from 17th Street.

The authorities in this state are uniform in holding that the owner of premises owes no greater duty to a licensee or even a trespasser than to not intentionally or purposely injure him. A distinction is closely drawn between acts of the owners when those acts are merely passive as contradistinguished from active ones. The latter are included in the general class of those intentionally committed. We need not accurately analyze these expressions, for we do not see in this record a necessity for it.

The acts of defendants which plaintiff contends constituted active negligence, such as to render them liable to a licensee, as shown by the pleadings, consists of a failure to keep a watchman at the point where he was injured to warn the public of the danger, while the street was closed by a standing train; failure to have an employee to cover the box into which plaintiff stepped, after it had been used for servicing the train, and a failure to keep and maintain a safe place of ingress and egress for the approach of the station for persons coming from the east and from 17th Street.

Each of the acts complained of is for the failure of defendants to do something which plaintiff contends was their duty. A failure or omission by a person to do a thing is passive and not active.

The evidence in this case is silent upon what we conceive to be the essential elements of the points relied upon under the last proposition. It does not appear that plaintiff knew that any other person had ever attempted to cross the premises where he attempted to cross; nor does it appear that any other member of the public ever traversed the grounds for any purpose where he was injured, in the nighttime. No person is shown to have ever previously attempted to approach the station from the east or 17th Street for the purpose of taking passage on one of the trains going out from the depot, and no necessity was shown why such provisions should have been made by the Station Company, nor that the west approach and entrance were inadequate for all purposes. Plaintiff made no effort to show by the evidence whether or not the boxes along the route followed by him were customarily closed or left open for use by the employees; nor was it shown how long the lid had been off the box into which he stepped; indeed, there is no evidence in the record showing that the box was not actually in use by the employees when the accident happened; further, there was no evidence introduced showing that an employee took the lid off of the box or left it off after it was removed, or that any employee knew that the lid was off the box. In the absence of some evidence of the length of time the lid had been off the box,

it cannot be said that any employee was guilty of active negligence in failing to discover that the lid had been removed. There is nothing in the record which remotely tends to show that any duty rested upon defendants to keep a guard at each of these six boxes to warn the public of latent dangers incident to stepping into them, at nighttime when no person (other than employees) appears to have used the railway yards for a convenient passageway while on missions in no way connected with the business of either of the defendants.

The plaintiff testified that he had previously visited the station, when he accompanied a passenger leaving on a train; that he approached the station from the Jones Street side; he said he had never previously attempted to approach the station from 17th Street, as he did on the occasion when injured. When he attempted to go as he did to the station, by traveling between the passenger track and the service track east of it, he traveled in semi-darkness, yet light enough to see that the ground was wet in places and that steam was emitted from at least one of the boxes. He says he knew from past experience in the railway service that boxes similar to those on the premises in question were maintained around stations.

In view of all the facts developed, and those upon which no evidence was offered, we believe the trial court properly decided that there was no evidence to form an issue of whether or not the employees' failure to do the things enumerated constituted such active negligence as would render defendants liable for the injuries sustained by plaintiff. Authorities supporting our conclusions in this respect are: Shawver v. American Railway Express Co. et al., supra; Galveston, H. & S. A. R. Co. v. Matzdorf, 102 Tex. 42, 44, 112 S.W. 1036, 20 L.R.A.,N.S., 833, 132 Am.St.Rep. 849; Wichita Valley Ry. Co. v. Helms, Tex.Civ. App., 261 S.W. 225; Gulf C. & S. F. R. Co. v. Blackmon, Tex.Civ.App., 56 S.W.2d 199, writ refused. The proposition must be overruled.

The giving of the summary instruction for defendants was proper, and the judgment is affirmed.